JOSIAH RICH, Appellant, *v.* THE NEW YORK CENTRAL & HUD-SON RIVER RAILROAD COMPANY, Respondent.

While an omission to perform a contract-obligation is not a tort unless the omission is also the omission of a legal duty, such legal duty may arise not merely out of certain relations of trust and confidence, inherent in the nature of the contract itself, but may spring from extraneous circumstances not constituting elements of the contract as such, although connected with and dependent upon it.

A breach of a contract may be so intended and planned, fitted to time, circumstances and conditions, and interwoven into a scheme of oppression and fraud as to become, in its association with the attendant circumstances, a tortious act or omission.

It is not an answer to a claim to recover damages for such a tort, that the injury suffered was the result of a series of acts, some of which were lawful and innocent; nor is the plaintiff precluded from proving these lawful acts, which are essential links in the chain constituting the wrong complained of.

Plaintiff's complaint alleged in substance, among other things, that he was the owner of lands in the village of Y., adjoining the former site of defendants' depot at that place; that because of the vicinity of the depot, said lands were valuable for business purposes, and plaintiff had erected thereon stores and buildings, having borrowed the money for that purpose, which was secured by mortgage on the property; that because of the refusal of plaintiff and others to surrender to defendant, without compensation, certain valuable riparian rights, defendant removed its depot, whereby plaintiff's property was greatly depreciated in value, and could only be restored and saved from foreclosure by a restoration of the depot; that to secure this, plaintiff entered into a contract with defendant by which he surrendered to it said riparian rights, in consideration of defendant's agreement to re-establish within a reasonable time and forever thereafter to maintain its depot at the former site, and thereupon the mortgagee agreed to delay a foreclosure sale; that defendant built its depot on the old site, but because of plaintiff's refusal to consent to the closing of a street, which would seriously injure his property, without compensation in damages, said defendant, fully understanding plaintiff's position, willfully and maliciously violated its contract, and delayed a restoration of the depot, for the express purpose of preventing plaintiff from being enabled to ward off a foreclosure, and instigated and induced the mortgagee to foreclose, and the property was sold at a great sacrifice. Upon the trial of the action it was conceded that a good cause of action sounding in tort was stated in the complaint. Plaintiff offered to prove the agreement to restore the depot, and its breach; that the restoration would have greatly enhanced the value of plaintiff's property; also to show what defendant did in procuring and instigating the

foreclosure sale; also the declarations of defendant's officers as to the reasons for refusing to restore the depot; these were rejected as immaterial. *Held*, error.

(Argued December 7, 1881; decided January 17, 1882.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made July 18, 1879, which affirmed a judgment in favor of defendant, entered upon an order nonsuiting plaintiff on trial.

The complaint, in this action, alleged in substance that, about the year 1850, plaintiff, with others who were the owners of certain lands in the village of Yonkers, entered into an agreement with the Hudson River railroad to the effect that they would convey to said corporation a site for its depot, would fill in the same, and would lay out and grade their lands so as to give convenient communication between the depot and the business portion of said village, the said company agreeing to pay the actual cost of filling in the depot site, and to erect and ever after maintain its depot thereon. That said agreement was carried out, the site conveyed and the depot erected; that defendant succeeded to the rights, franchises and obligations of said Hudson River Railroad Company, and plaintiff acquired the titles of the other owners of said remaining lands; that there was a navigable inlet crossed by said railroad, which, together with the stream discharging into it, was known as the Nepperham or Saw-mill river; that said Hudson River Railroad Company, having no right to cut off or obstruct the navigation in said inlet, had constructed and maintained a drawbridge over it. That it subsequently procured the passage of an act of the legislature, authorizing it to bridge said inlet without any opening or draw, on making compensation to the riparian owners. That defendant, to avoid the payment of damages to said owners, "resolved to accomplish the same object by artifice and strategy;" and so threatened said riparian owners that unless they would surrender their rights, and consent to the construction of such bridge, it would remove its

depot, and, upon said owners refusing so to do, did remove its depot to a point above a third of a mile north; that plaintiff, a short time previous to the threatened removal, had borrowed, on his bond secured by mortgage on his said lands, the sum of $35,-000, most of which was expended in erecting stores on his said lands, directly opposite and about one hundred feet south of said depot, and if the depot had not been removed, could have rented said stores and the adjacent lots for $5,000 per annum, and could have sold other lots for sufficient to pay off said mortgage, but that in consequence of such removal his premises became wholly unproductive and unsaleable; that, in order to have the depot restored to its original site and to save his property from being sacrificed, he was induced and coerced into giving his consent to the closing of said draw-bridge, and an agreement was entered into on March 7, 1877, in and by which defendant, in consideration of such consent, agreed that it would, " as soon as practicable, and within a reasonable time, build and forever thereafter maintain its principal passenger depot for Yonkers" upon said original site. That defendant thereupon removed the draw-bridge and erected a permanent bridge over the inlet. That it also erected a new depot on the old site, and had the same ready for use about April 15, 1878, but absolutely refused to open or establish its depot there unless the common council of Yonkers would pass an ordinance declaring and ordering the closing of a portion of a street which crossed its tracks, so that it could build a fence inclosing said tracks which would so exclude the plaintiff and others from the right and privilege of crossing said tracks to the steamboat docks on the Hudson river. That defendant procured the passage of an act of the legislature amending the charter of Yonkers so as to provide for the assessment and payment of damages claimed by the owners of land injuriously affected by the closing of a street. That the closing of said street would have damaged plaintiff's property to, at least, the sum of $50,000, and would have neutralized, in great measure, all the benefits derived from the restoration of the depot; that plaintiff and others sent in remonstrances to the common council against

such discontinuance, and it refused to pass an ordinance to that effect, because of the large amount of damages the city would have to pay; that upon such refusal being made known, defendant's officers publicly asserted that it would never open said new depot until said ordinance was passed, and would tear down the new depot, or use it exclusively for freight. "In all of which the defendant was actuated by malice and vindictiveness toward plaintiff, and a design to crush, ruin and destroy him;" that in consequence of the removal of the depot and the consequent unproductiveness of plaintiff's property, he was unable to pay the interest on said bond and mortgage. Foreclosure was commenced, and a decree of foreclosure and sale was made; but that the mortgagee had foreborne selling to give to plaintiff the benefit of the re-establishment of the depot; that defendant's officers and agents, after the refusal of the common council to pass the said ordinance, called upon the mortgagee and induced it "to withdraw the grace and favor" accorded to plaintiff, and to advertise the property immediately for sale, so as to cut off plaintiff's claim for damages, the mortgagee having been induced to waive any such claim; that the "scheme or plan which had been so concocted and arranged by and in the interest and for the special benefit and advantage of the defendant, to enable it to evade and violate with impunity its aforesaid covenant and obligation with the plaintiff * * * and to escape the payment of its fair and just proportion of the plaintiff's damages on the closing of said street, was fully carried out and executed by the instigation and connivance of the defendant;" that plaintiff's entire property was sold under said decree, and bid off by the mortgagee for $20,000, and thereupon the ordinance was passed closing said street, and defendant immediately opened the new depot. The complaint closes thus: "That the defendant, by means of the wrongs, injuries and grievances aforesaid, and its malicious and unlawful actions in doing as aforesaid, has inflicted pecuniary loss and damage upon the plaintiff to the amount of $150,000," for which sum judgment was asked.

Upon the trial, plaintiff offered in evidence the agreement of 1877, which was objected to and excluded as irrelevant and incompetent. Plaintiff also offered to show the alleged breach of that contract, the value of the property conveyed to defendant, and the establishment of the depot originally thereon; that defendant caused and procured the sale of plaintiff's property under the foreclosure decree, to deprive him of his claim for damages for closing the street; that it was sold for less than one-fifth of its value; that plaintiff was dispossessed at the instigation of defendant, and that if the depot had been reestablished the market value of the property would have been largely increased. Plaintiff also offered to prove an interview with defendant's officers in reference to the removal and reestablishment of the depot, and the reasons they assigned for the removal and refusal to restore it, and also the amount of damage sustained by plaintiff in consequence of defendant's omission and refusal to re-establish the depot under the agreement of 1877, all of which was objected to and excluded on the same ground.

Defendant moved for a dismissal of the complaint on the following grounds:

"*First* — Because the plaintiff has not laid the foundation, by any of the several agreements in evidence, to sustain a cause of action for damages arising from any wrongful act of the defendant in respect to the property of the plaintiff.

*Second* — Because the gist of this action is the malicious and unlawful acts of the defendant in pursuing a scheme or plan to injure the plaintiff by depriving him of his property, based upon an alleged malicious violation of certain alleged contracts. The proof offered fails to make out any cause of action as set forth in the complaint, and would not sustain any verdict against the defendant for any damages in this action.

*Third* — Because the complaint sets forth but a single cause of action, and the plaintiff cannot legally found a claim for damages upon the alleged breach of any one of the several agreements or contracts referred to."

The motion was granted.

*R. W. Van Pelt* for appellant. In what was formerly known as an "action on the case," any damages may be recovered therein that the complaint is broad enough to cover. (*Ilion Bk.* v. *Carver*, 31 Barb. 230.) But one cause of action is stated in the complaint, and that is, for willful and wrongful violation of the several contracts, pledging to plaintiff the benefits to be derived from the establishment of the depot, and instigating the sacrifice of his property, instead of giving to him those benefits. (*Bebinger* v. *Sweet*, 1 Abb. N. C. 263; *Woodbury* v. *Deloss*, 65 Barb. 501; *Hubbell* v. *Lerch*, 62 id. 295; affirmed, 58 N. Y. 237.) Where fraud is an essential element in the cause of action itself, it must be charged in the complaint to give the defendant an opportunity of meeting it, and it must be proven upon the trial. (*Conaughty* v. *Nichols*, 42 N. Y. 83; *Wood* v. *Henry*, 40 id. 124; *Ross* v. *Martin*, 51 id. 108; *Degraw* v. *Elmore*, 50 id. 1; *Graves* v. *Waite*, 59 id. 156; *Elwood* v. *Gardner*, 45 id. 354.) This action cannot be split up and made into actions *ex contractu* and others *ex delicto*. It must be treated as a whole. (*Jones* v. *Steamship Cortes*, 17 Cal. 487; *People* v. *Tweed*, 5 Hun, 353; affirmed, 63 N. Y. 194.) If the complaint states several causes of action, they all arise out of the same transaction or transactions connected with the subject of the action, and they are consistent with each other. (*Goldberg* v. *Utley*, 60 N. Y. 427; Code, § 499; *Bebinger* v. *Sweet*, 1 Abb. N. C. 263.) Under the original contract and arrangement between plaintiff and the Hudson River R. R. Co., the company was bound to maintain its depot upon the site acquired for that purpose. (2 R. S. 523, 525, 527, §§ 14, 17, 18, 26 [Banks' 6th ed.]; *N. Y. C. & M. R. R.* v. *Guerin*, 1 Hun, 496; *Fay* v. *Johnson*, 12 How. Pr. 316; *Richard* v. *Edricks*, 17 Barb. 260; *Barton* v. *McLean*, 5 Hill, 256.) The removal of the station by the defendant without the consent of plaintiff, even for reasonable cause, was a violation of its original agreement, and it became liable for his direct and actual damages, the question to be tried by the jury being, "What was the extent of the injury which resulted to the plaintiff by the abandonment and discontinuance of the

depot at this site and its removal to another place." (*B. & S. R. R. Co.* v. ——, 2 Gill [Md.], 20; *Chapman* v. *M. R. & L. E. R. R.*, 6 Ohio, 119; *Mahaska Co. R. R. Co.* v. *Des Moines Valley R. R. Co.*, 28 Iowa, 437; *Jenkins* v. *B. & M. R. R. Co.*, 29 id. 255.) The agreement for the deed and the water grant accompanying the deed of the depot site is to be regarded as forming a part of the deed of the site, and both papers are to be construed together and treated as one. (2 Abb. Dig. [3d ed.] 586; *Flagg* v. *Munger*, 9 N. Y. 176; *Creig* v. *Wells*, 11 id. 315; *Stow* v. *Swift*, 15 Johns. 488; *Jackson* v. *Dunstagh*, 1 Johns. Ch. 91; *N. Y. Dry Dock Co.* v. *Ruttman*, 30 N. Y. 176.) Defendant's violation of its agreement entitles plaintiff to a larger and more liberal measure of damages; and the fact that he has a remedy in an action for a breach of contract is no answer. (*Moody* v. *Baker*, 5 Cow. 351; *Munge* v. *Baker*, 69 Barb. 539; *Baker* v. *Kent*, 19 Johns. 223; *Dunmont* v. *Smith*, 4 Denio, 217.) Special damages, necessarily resulting for injuries complained of, can also be recovered when specially claimed. (41 How. 428; 2 Barb. 525; 4 S. & S. 392; 4 Daily, 314; 16 Abb. 311.) A wrong-doer is responsible for all damages necessarily resulting from his wrongful act. (*Newton* v. *Tweed*, 2 Sweeney, 67; *Shepard* v. *Ryer*, 16 Johns. 497; *Sharen* v. *Moslem*, 17 Barb. 518.) Plaintiff is entitled to exemplary and punitory damages. (*Hark* v. *C. & A. R. R. Co.*, 45 Barb. 40; *Tift* v. *Culver*, 3 Hill, 180; *Walker* v. *Wilson*, 8 Bosw. 586; *Edwards* v. *Beebe*, 48 Barb. 106; *Lewis* v. *Buckley*, 4 Daily, 156; *Caldwell* v. *N. J. Stbt. Co.*, 47 N. Y. 282; *The Amiable Nancy*, 3 Wheat. 546; *La Amistad*, 5 id. 385.) Mere delay in performing contract would render defendant liable for damages. (*Parmalee* v. *Wilks*, 32 Barb. 539.) A corporation is liable for a tort. (*McClure* v. *Suprs. of Niagara*, 50 Barb. 594; *Howel* v. *Buffalo*, 15 N. Y. 512; *Williams* v. *Dunkirk*, 3 Sandf. 44; *Chase* v. *N. Y. C. R. R. Co.*, 24 Barb. 273; *Francis* v. *Schoelkopf*, 53 N. Y. 152; *Dervint* v. *Wiltse*, 9 Wend. 325.) The defendant, even in the absence of the original contract

establishing the depot, would be liable for the damages sustained by plaintiff from a negligent, improper or wrongful exercise of its legitimate powers and functions in removing it. (*Lacom* v. *New York*, 3 Duer, 416 ; *Wademan* v. *A. & S. R. R. Co.*, 51 N. Y. 568 ; 12 Barb. 227 ; 39 id. 289 ; 3 Denio, 486.) This action may also be regarded as for a conspiracy. (*Forsyth* v. *Eminst*, 11 How. 408 ; *Tappan* v. *Powers*, 2 Hall, 277 ; *Mussina* v. *Clark*, 17 Abb. 188.) Malice is the intentional doing of a wrongful act with knowledge of its character and without just cause or excuse. (*State* v. *York*, 9 Metc. 104 ; *Wiggins* v. *Coffin*, 3 Story, 7.)

*William Allen Butler* for respondent. The character of an action must be tested and determined by the substantial allegations of the complaint, and where the averments are such as to indicate that the whole scope and purpose of the action are to recover for alleged wrongs, the plaintiff cannot recover for breach of contract. (*Ross* v. *Mather*, 57 N. Y. 108 ; *Graves* v. *Waite*, 59 id. 156 ; *DeGraw* v. *Elmore*, 50 id. 1 ; *Conaughty* v. *Nichols*, 42 id. 86 ; *Lockwood* v. *Quackenbush*, 83 id. 607.) At the trial it was competent for the plaintiff, under the issue of fact joined by the pleadings, to give evidence of any of the alleged wrongful acts charged in the complaint, as a basis for the claim of damages which he asserted. (*Conaughty* v. *Nichols*, 42 N. Y. 83 ; *Lockwood* v. *Quackenbush*, 83 id. 607.) Plaintiff's claim, that a railroad company which has contracted with land-owners on its line to fill in a site for a depot, paid them in full for the work, purchased the site and taken a conveyance of it without any covenant or agreement as to its use, becomes liable in tort for a breach of duty, if it afterward removed the depot to another site, is untenable. (1 Addison on Torts [Dudley & Bailey's ed. 1876], 17 ; *Frey* v. *Johnson*, 22 How. Pr. 318 ; *Spencer* v. *Tobey*, 22 Barb. 260 ; *Barton* v. *McLean*, 5 Hill, 256 ; *Lacour* v. *Mayor of New York*, 3 Duer, 406 ; *Jackson* v. *McClellan*, 8 Cow. 295 ; *Palmer* v. *Fort Plain Plank R'd Co.*, 11 N. Y. 376 ; *Nicoll* v. *N. Y. & Erie R. R. Co.*, 12 id. 121.)

FINCH, J. We have been unable to find any accurate and perfect definition of a tort. Between actions plainly *ex contractu* and those as clearly *ex delicto* there exists what has been termed a border-land, where the lines of distinction are shadowy and obscure, and the tort and the contract so approach each other, and become so nearly coincident as to make their practical separation somewhat difficult. (Moak's Underhill on Torts, 23.) The text writers either avoid a definition entirely (Addison on Torts), or frame one plainly imperfect (2 Bouvier's Law Dict. 600), or depend upon one which they concede to be inaccurate, but hold sufficient for judicial purposes. (Cooley on Torts, 3, note 1; Moak's Underhill, 4; 1 Hilliard on Torts, 1.) By these last authors a tort is described in general as "a wrong independent of contract." And yet, it is conceded that a tort may grow out of, or make part of, or be coincident with a contract (2 Bouvier [*supra*],), and that precisely the same state of facts, between the same parties, may admit of an action either *ex contractu* or *ex delicto*. (Cooley on Torts, 90.) In such cases the tort is dependent upon, while at the same time independent of the contract; for if the latter imposes a legal duty upon a person, the neglect of that duty may constitute a tort founded upon a contract. (1 Addison on Torts, 13.)

Ordinarily, the essence of a tort consists in the violation of some duty due to an individual, which duty is a thing different from the mere contract obligation. When such duty grows out of relations of trust and confidence, as that of the agent to his principal or the lawyer to his client, the ground of the duty is apparent, and the tort is, in general, easily separable from the mere breach of contract. But where no such relation flows from the constituted contract, and still, a breach of its obligation is made the essential and principal means, in combination with other and perhaps innocent acts and conditions, of inflicting another and different injury, and accomplishing another and different purpose, the question whether such invasion of a right is actionable as a breach of contract only, or also as a tort, leads to a somewhat difficult search for a distinguishing test.

In the present case, the learned counsel for the respondent

seems to free himself from the difficulty by practically denying the existence of any relation between the parties, except that constituted by the contract itself, and then, insisting that such relation was not of a character to originate any separate and distinct legal duty, argues that, therefore, the bare violation of the contract obligation created merely a breach of contract, and not a tort. He says that the several instruments put in evidence showed that there never had been any relation between the plaintiff and the railroad company, *except* that of parties contracting in reference to certain specific subjects, by plain and distinct agreements, for any breach of which the parties respectively would have a remedy, but none of which *created any such rights* as to lay the foundation for a charge of willful misconduct or any other tortious act. Upon this theory the case was tried. Every offer to prove the contracts, and especially their breach, was resisted upon the ground that the complaint, through all its long history of plaintiff's grievances, alleged but a single cause of action and that for a tort, and, therefore, something else, above and beyond and outside of a mere breach of contract, must be shown, and proof of such breach was immaterial. From every direction in which the plaintiff approached the allegations of his complaint, the same barrier obstructed his path and excluded his proof. Whatever may be true of the earlier agreements between the plaintiff and the railroad company, and conceding, what seems probable, that the evidence relating to them was properly rejected, on the ground that they left the defendant entirely at liberty to change the site of its depot, so that such change was in no respect either unlawful or wrong; there was yet a later agreement by the terms of which the defendant was bound, as soon as practicable and within a reasonable time, to restore the depot to its old location. The complaint explains the importance of such restoration to the plaintiff. It alleges that valuable property of his, heavily mortgaged, had depreciated in value in consequence of the removal of the depot, and could only be restored to something like its old value, and saved from the sacrifice of a foreclosure in a time of depression, by the prompt return

of the depot to its former site. The complaint further avers, that to secure this result, the plaintiff had surrendered valuable riparian rights to the defendant, but the latter, fully understanding the situation, maliciously and willfully broke its agreement, and delayed a restoration of the depot for the express purpose of preventing plaintiff from being enabled to ward off a foreclosure of the mortgage, and itself instigated such foreclosure and caused the ultimate sacrifice. For the breach of this contract to restore the depot within a reasonable time, the plaintiff had a cause of action. But that was not the one with which he came into court. His complaint was for a single cause of action, and that for a tort; and what that alleged tort was, it is quite necessary to know, and in what respect, and how it differs from a mere breach of contract, in order to determine whether the rejected proofs were admissible or not.

That a good cause of action, sounding in tort, was stated in the complaint was not denied upon the trial. Neither by demurrer nor by motion was the sufficiency of the complaint in any manner assailed. The second ground upon which a nonsuit was asked practically confessed that there was a good cause of action but merely a failure to prove it. The ground stated was, " because the gist of this action is the malicious and unlawful acts of the defendant in pursuing a scheme or plan to injure the plaintiff by depriving him of his property, based upon an alleged malicious violation of certain alleged contracts; but the proof offered fails to make out any cause of action as set forth in the complaint." The opinion of the General Term distinctly concedes the point, saying, that the facts alleged made out " a clear case of fraud." And on the present appeal the learned counsel for the respondent explicitly admits, in his brief, that it was competent for the plaintiff, under the issue of fact joined by the pleadings, to give evidence of any of the alleged wrongful acts charged in the complaint, as a basis for the claim of damages which he asserted. There was, therefore, something to try; something which was susceptible of proof; a tortious act or omission, or a series of such acts or omissions, properly alleged in the complaint and open to the

plaintiff's evidence. Why he was not permitted to have a single one of the forty questions put to his witnesses answered becomes, now, the important inquiry. It will not be necessary to consider them all, for many were excluded for a defect in their form, or because totally immaterial, or in the exercise of the proper discretion as to the order of proof, but enough remain, and may be grouped together, to raise the serious question argued at the bar.

The plaintiff offered to show the agreement of March, 1877, between himself and the railroad company, for the restoration of the depot to its original site within a reasonable time, and the breach of that agreement by the defendant company. The objection, put upon the ground that the offered proof was irrelevant and incompetent, was sustained and the evidence excluded. The plaintiff then sought to show how long a time elapsed, after the execution of the contract, before the depot was re-established at the foot of Main street; whether an interval did occur, and how much time elapsed from the date of the contract to the building of the new depot, which evidence was also excluded as immaterial. A series of questions were further put, to show what the defendant did, if any thing, in and about procuring plaintiff's mortgaged property to be sold and sacrificed under the mortgage; when the foreclosure took place; at whose instigation; and at what price, compared with its real value, the property was sold. These questions were excluded. The plaintiff also attempted to show that the re-establishment of the depot at the foot of Main street would have largely increased the value of his adjoining property covered by the mortgage. That evidence was rejected. The plaintiff was then asked if he had an interview with the officers of the defendant in reference to the removal and the re-establishment of the depot. This question was objected to, and the only ground assigned was, " as it is in writing." No proof of that was given; the case shows nothing but the assertion of the party objecting, and thereupon the witness was not permitted to answer the inquiry, whether he had an interview, at all. He was then asked what reasons they assigned for removing the

depot and refusing to bring it back, and this was excluded. And in the end the plaintiff was nonsuited because he had given no proof of a tort or a fraud. He now insists that he was first debarred from giving such proof, and then nonsuited because he had not given it.

The exclusion of proof of the contract for re-establishing the depot, and the willful and intended breach of that contract, brings up for our consideration the question principally argued. Such exclusion must rest for its justification upon the theory of the defendant's counsel, already adverted to, which we are troubled to reconcile with his concession that a cause of action was alleged in the complaint. At the foundation of every tort must lie some violation of a legal duty, and, therefore, some unlawful act or omission. (Cooley on Torts, 60.) Whatever, or however numerous or formidable, may be the allegations of conspiracy, of malice, of oppression, of vindictive purpose, they are of no avail; they merely heap up epithets, unless the purpose intended, or the means by which it was to be accomplished, are shown to be unlawful. (*O' Callaghan* v. *Cronan*, 121 Mass. 114; *Mahan* v. *Brown*, 13 Wend. 261.) The one separate and distinct unlawful act or omission alleged in this complaint, or rather the only one so separable which we can see may have been unlawful, was the unreasonable delay in restoring the depot to its original location; and that was unlawful, not inherently or in itself, but solely by force of the contract with plaintiff. The instigation of the sale on fore- closure, as a separate fact, may have been unkind or even malicious, but cannot be said to have been unlawful. The mortgagee had a perfect right to sell, judicially established, and what it might lawfully do, it was not unlawful to ask it to do. The act of instigating the sale may be material and have force, as one link in a chain of events, and as serving to explain and characterize an unlawful purpose, pursued by unlawful means; but, in and of itself, it was not an unlawful act, and cannot serve as the foundation of a tort. (*Randall* v. *Hazelton*, 12 Allen, 412.) We are forced back, therefore, to the contract for re-establishing the depot and its breach as the basis or

foundation of the tort pleaded. If that will not serve · the purpose in some manner, by some connection with other acts and conditions, then there was no cause of action for a tort stated in the complaint. We are thus obliged to study the doctrine advanced by the respondent, and measure its range and extent. It rests upon the idea that unless the contract creates a relation, out of which relation springs a duty, independent of the mere contract obligation, though there may be a breach of the contract, there is no tort, since there is no duty to be violated. And the illustration given is the common case of a contract of affreightment, where, beyond the contract obligation to transport and deliver safely, there is a duty, born of the relation established to do the same thing. In such a case, and in the kindred cases of principal and agent, of lawyer and client, of consignor and factor, the contract establishes a legal relation of trust and confidence; so that upon a breach of the contract there is not merely a broken promise, but, outside of and beyond that, there is trust betrayed and confidence abused; there is constructive fraud, or a negligence that operates as such, and it is that fraud and that negligence which, at bottom, makes the breach of contract actionable as a tort. (*Coggs* v. *Bernard*, 2 Lord Raym. 909; *Orange Bank* v. *Brown*, 3 Wend. 161, 162.)

So far we see no reason to disagree with the learned counsel for the respondent save in one respect, but that is a very important one. Ending the argument at this point leaves the problem of the case still unsolved. If a cause of action for a tort, as is admitted, was stated in the complaint, it helps us but little to learn what it was not, and that it does not fall within a certain class of exceptional cases, and cannot be explained by them. We have yet to understand what it is, if it exists at all, as a necessary preliminary to any just appreciation of the relevancy or materiality of the rejected evidence. The General Term, as we have remarked, described the tort pleaded as a "clear case of fraud." If that be true, it cannot depend upon a fiduciary or other character of the relation constituted by the contract merely, for no such relation existed; and there

must be some other relation not created by the contract alone, from which sprang the duty which was violated. Let us analyze the tort alleged somewhat more closely.

At the date of the contract, the complaint shows the relative situation and needs of the two parties. The railroad company desired to close the draw over the Nepperhan river, and substitute a solid bridge. With the growth of its business, and the multitude of its trains the draw had become a very great evil, and a serious danger. The effort to dispense with it was in itself natural and entirely proper. On the other hand the plaintiff was both a riparian owner above the draw, and likely to be injured in that ownership by a permanent bridge, and had suffered, and was still suffering from a severe depreciation in the value of his property near Main street by the previous removal of the railroad station. The defendant was so far master of the situation, that it could and did shut up the plaintiff to a choice of evils. He might insist upon the draw, and leave his mortgaged property to be lost from depreciation, and save his riparian rights, or he might surrender the latter to save the former. This last was the alternative which he selected, and the contract of 1877 was the result. In the making of this contract there was no deceit or fraud, and no legal or actionable wrong on the part of the defendant. If it drove a hard bargain, and had the advantage in the negotiation, it at least invaded no legal right of the plaintiff, and he was free to contract or not as he pleased. The complaint does not allege that at the execution of this agreement there was any purpose or intention of not fulfilling its terms. The tort, if any, originated later. What remains then is this: the railroad company conceived the idea of closing Main street to any travel where it passed their tracks at grade; of substituting a bridge crossing in its stead; and of fencing in its track along the street beneath, so as to compel access to the cars through its depot in such manner that the purchase of tickets could be compelled. This in itself was a perfectly lawful purpose. The grade crossing was a death-trap, and the interest of the company and the safety of individuals alike made a change desirable, and

the closing in of the depot was in no sense reprehensible. But there was a difficulty in the way. This plaintiff again stood as an obstacle in the path. The closing of Main street, though beneficial to the company, was to him and his adjoining property claimed to be a very serious injury. He declined to consent, except upon the condition of an award of heavy damages, and in dread of that peril the common council refused to pass the necessary ordinance. At this point, according to the allegations of the complaint, if at all or ever, arose the tort. It is alleged that the defendant, in order to reach a lawful result, planned a fraudulent scheme for its accomplishment by unlawful means, and through an injury to the plaintiff, which would strip him of his damages by a complete sacrifice of his property. That plan was executed in this manner. The company willfully and purposely refused to perform its contract. It had built its permanent bridge over the Nepperhan, and so received the full consideration of its promise; its new depot was substantially finished and ready for occupation; and no just reason remained why its contract should not be fulfilled. But the company refused. It did not merely neglect or delay; it openly and publicly refused. The purpose of that public refusal was apparent. It was to drive the plaintiff's mortgagee to a foreclosure; it was to shut out from plaintiff that appreciation of his property which would enable him to save it; it was to strip him of it, so as to extinguish the threatened damages, and thus procure the assent of the common council, and get Main street closed. This unlawful refusal to perform the contract, this deliberate announcement of the purpose not to restore the depot, was well calculated to influence the mortgagee toward a foreclosure. But the defendant's direct instigation was added. The foreclosure came; the mortgagee bid in the property at a sacrifice; swiftly followed a release of damages, an ordinance of the common council; the closing of Main street, and then the restoration of the depot.

We are thus able to see what the tort pleaded was. It was not a constructive fraud, drawn from the violation of a duty imposed by law out of some specific relation of trust and con-

fidence, but an actual and affirmative fraud; an alleged scheme to accomplish a lawful purpose by unlawful means. There was here, on the theory of the complaint, something more than a mere breach of contract. That breach was not the tort; it was only one of the elements which constituted it. Beyond that and outside of that there was said to have existed a fraudulent scheme and device by means of that breach to procure the foreclosure of the mortgage at a particular time and under such circumstances as would make that foreclosure ruinous to the plaintiff's rights, and remove him as an obstacle by causing him to lose his property, and thereby his means of resistance to the purpose ultimately sought. In other words, the necessary theory of the complaint is that a breach of contract may be so intended and planned; so purposely fitted to time, and circumstances and conditions; so inwoven into a scheme of oppression and fraud; so made to set in motion innocent causes which otherwise would not operate, as to cease to be a mere breach of contract, and become, in its association with the attendant circumstances, a tortious and wrongful act or omission.

It may be granted that an omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty. But such legal duty may arise, not merely out of certain relations of trust and confidence, inherent in the nature of the contract itself, as in the cases referred to in the respondent's argument, but may spring from extraneous circumstances, not constituting elements of the contract as such, although connected with and dependent upon it, and born of that wider range of legal duty which is due from every man to his fellow, to respect his rights of property and person, and refrain from invading them by force or fraud. It has been well said that the liability to make reparation for an injury rests not upon the consideration of any reciprocal obligation, but upon an original moral duty enjoined upon every person so to conduct himself, or exercise his own rights as not to injure another. (*Kerwhacker* v. *C. C. & C. R. R. Co.*, 3 Ohio St. 188.) Whatever its origin, such legal duty is uniformly recognized, and has been constantly applied as the foundation of actions for

wrongs; and it rests upon and grows out of the relations which men bear to each other in the framework of organized society. It is then doubtless true, that a mere contract obligation may establish no relation out of which a separate or specific legal duty arises, and yet extraneous circumstances and conditions, in connection with it, may establish such a relation as to make its performance a legal duty, and its omission a wrong to be redressed. The duty and the tort grow out of the entire range of facts of which the breach of the contract was but one. The whole doctrine is accurately and concisely stated in 1 Chit. Pl. 135, that "if a common-law duty result from the facts, the party may be sued in tort for any negligence or misfeasance in the execution of the contract." It is no difficulty that the mortgagee's agreement to give time, and postpone the sale for plaintiff's benefit was invalid, and a mere act of grace which could not have been compelled. If it is made plain that the mortgagee would have waited but for the fraudulent scheme and conduct of the defendant, that is enough. (*Benton* v. *Pratt*, 2 Wend. 385; *Rice* v. *Manley*, 66 N. Y. 83.) Nor is it a difficulty that the injury suffered was the result of a series of acts some of which were lawful and innocent. (Cooley on Torts, 70; *Bebinger* v. *Sweet*, 1 Abb. N. C. 263.)

Assuming now that we correctly understand what the tort pleaded was, and which was conceded to constitute a cause of action, it seems to us quite clear that the plaintiff was improperly barred from proving it. From the very nature of the case a fraud can seldom be proved directly, and almost uniformly is an inference from the character of the whole transaction, and the surrounding and attendant circumstances. Proof of the contract and its breach, of the delay in restoring the depot and the reasons therefor were essential links in the chain. If the proof should go no further, a nonsuit would be proper, but without these elements the tort alleged could not be established at all. And so the situation of the parties as it respected their several properties, the existence of the mortgage, the agreement to postpone the sale were elements of the transaction proper to be shown. The plaintiff's interview with the officers of

the defendant company, and their statement of the reasons for refusing to restore the depot were improperly excluded. While we cannot know what it was which actually occurred, it is very plain that their statement of reasons would bear materially upon the issues involved.

We are not concerned with the question of the wisdom of the plaintiff's choice of his form of action, or of what may result if the cause of action pleaded as a tort shall be hereafter assailed, instead of its sufficiency being conceded. It may well be that he has chosen the one most difficult to maintain, and that an action upon one or more of the contracts would be less surrounded by difficulties. But we have nothing to do with his choice. He is entitled to prove his cause of action if he can.

The judgment should be reversed, and a new trial granted, costs to abide the event.

All concur, except RAPALLO and MILLER, JJ., not voting.

Judgment reversed.